IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


MARK SHEPHERD,

        Plaintiff,

v.                                            Civil Action No.2:04-CV-69

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
           Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.    <u>Background</u>

    Plaintiff, Mark W. Shepherd, (Claimant), filed his Complaint on September 22, 2004, seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1] Commissioner filed her Answer on January 10, 2005.[2] Claimant filed his Motion for Summary Judgment and Brief in Support Thereof on February 22, 2005.[3] Commissioner filed her Motion for Summary Judgment and Brief in Support Thereof on March 21, 2005.[4] Claimant filed his response to Commissioner's Motion for Summary Judgment

---

[1] Docket No. 1.

[2] Docket No. 2.

[3] Docket Nos. 6 and 7.

[4] Docket Nos. 9 and 10.

on April 4, 2005.[5]

B.    The Pleadings

      1.    Claimant's Motion for Summary Judgment and Brief in Support Thereof.

      2.    Commissioner's Motion for Summary Judgment and Brief in Support Thereof.

      3.    Claimant's Reply to Commissioner's Motion for Summary Judgment.

C.    Recommendation

      1.    I recommend that Claimant's Motion for Summary Judgment be DENIED and that the Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically, the Appeals Council adequately explained why it found that Dr. Joseph Snead's report and additional VA records would not have changed the ALJ's decision. Additionally, Claimant's subsequent evidence is not new. Finally, the ALJ properly assessed Claimant's credibility.

## II. Facts

A.    Procedural History

On May 11, 2001, Claimant filed for Disability Insurance Benefits (DIB) alleging disability since February 22, 2001. The application was denied initially and on reconsideration. A hearing was held on August 5, 2002 before an ALJ. The ALJ's decision, dated December 27, 2002, denied the claim finding Claimant not disabled within the meaning of the Act. The Appeals Council denied Claimant's request for review of the ALJ's decision on July 20, 2004. This action was filed and proceeded as set forth above.

_____

[5] Docket No. 11.

B.   Personal History

Claimant was 40 years old on the date of the August 5, 2002 hearing before the ALJ.

Claimant has a high school education and past relevant work experience as a technical aircraft

mechanic and as a glue technician.

C.   Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: February 22, 2001-December 27, 2002.

**Urgent Medical Care Center, Kristin Mangum, PA-C, 12/21/1998, Tr. 128-129**
LS sprain resolved. [Illegible] Release to work full duty.
Work Comp, Yes.  Off Work, approximately 0 days.  Modified work, if available, approximately
0 days.

**Urgent Medical Care Center, Kristin Mangum, 12/14/1998, Tr. 130-131**
LS strain, LS spondylolysis.
Work Comp, Yes.  Modified work, if available, approximately 7 days. No lifting over 10-15
pounds.  No repetitive twisting or bending.

**Urgent Medical Care Center, 12/11/1998, Tr. 132**
Radiological Consultation: probable spondylolysis of L-5.

**Urgent Medical Care Center, Statement of Physical Capabilities, 12/9/1998, Tr. 133-134**
Diagnosis, LS strain.
In an 8-hr. day, employee can stand/walk:      3-5 hours.
In an 8-hr. day, employee can sit:                    1-3 hours.
Employee can lift:                                            Up to 10 lbs.
Employee can use hands for repetitive:         Simple Grasping, Yes.
                                                                        Pushing and Pulling, Yes.
                                                                        Continuously Fine Manipulation, Yes.
Employee can use feet for repetitive
movements (as in operating foot controls):    Yes.
Employee is able to :                                       Bend, Not at all
                                                                        Climb, Not at all
                                                                        Carry, Occasionally
                                                                        Kneel, Not at all
Employee is able to reach above shoulder
level:                                                              Yes
Employee is able to work:                               8 hours/day.

Overtime:                                No

Work Comp, No.
Modified work, if available: approximately 6 days.
No lifting over 10 pounds.
No repetitive twisting or bending.

**Urgent Medical Care Center, Kristin Magnum, 12/4/1998, Tr. 136**
Diagnosis: LS strain

**Trillium Hospital, Radiology Report, Allan Paris, D.O., Lumbar Spine, 11/08/00, Tr. 137**
FINDINGS:

Anteroposterior, lateral, and right and left oblique projections of the lumbar spine, plus a lateral projection of the lumbosacral junction demonstrate:

1.      Vertebral alignment is normal. The levoscoliosis of the thoracolumbar spine, identified January 28, 2000, is not present on the current examination.
2.      No roentgen evidence of recent fracture of lumbar segments.
3.      Spondylolysis of fifth lumbar vertebra with first degree spondylolisthesis of fifth lumbar vertebra relative to first sacral segment.
4.      Loss of height of lumbosacral disc with vacuum phenomenon, eburnation of adjacent end plates, and osteophytes, consistent with degenerative disc disease.
5.      Calcified aortic atheromata.

**Trillium Hospital, Allan Paris, D.O., MRI of Lumbar Spine, 2/13/00, Tr. 138-139**
CONCLUSION:
1.      Posterocentral bulge, fourth lumbar disc, without evidence of spinal stenosis or neural impingement.
2.      Bilateral spondylolysis of fifth lumbar vertebrae with first degree spondylolisthesis of fifth lumbar vertebra relative to first sacral segment.
3.      Diminished height and hydration of fifth (lumbosacral) disc with broad based posterior extrusion, entering the intervertebral foramina bilaterally, more pronounced on the right. The intervertebral foraminal fat, between the fifth lumbar vertebra and first sacral segment, is diminished bilaterally.
4.      Degenerative hypertrophic changes of apophyseal joints between fifth lumbar vertebra and first sacral segment.
5.      Multiple Schmorl node deformities.
6.      Hemangioma, third lumbar vertebral body.

**Trillium Hospital, Allan Paris, D.O., MRI of Lumbar Spine, 1/28/00, Tr. 140**
FINDINGS:
1.      Shallow levoscoliosis of thoracolumbar spine.
2.      No roentgen evidence of recent fracture of lumbar segments.
3.      Spondylolysis, fifth lumbar vertebra, with first degree spondylolisthesis of fifth

lumbar vertebra relative to sacral base.
4.  Loss of height of lumbosacral disc with vacuum phenomenon, eburnation of adjacent end plates, and osteophytes, consistent with degenerative disc disease.
5.  Calcified aortic atheromata.

**Horace Davis, D.O., 6/23/2000. Tr. 150**
Assessment: Spondylolisthesis.

**Horace Davis, D.O., Disability Certificate, 1/28/00, Tr. 153**
This is to certify that Mark Shepherd has been under my professional care and was totally incapacitated from 1/28/00 to 1/29/00. As of this date, he/she is sufficiently recovered to resume a normal workload.

**Foote Hospital, Harish Rawal. M.D., Operative Report, 3/01/2001, Tr. 158**
Preoperative Diagnosis: Persistent back pain with leg radiculopathy.
Postoperative Diagnosis: Persistent back pain with leg radiculopathy.

**Department of Veterans Affairs–Pittsburgh Healthcare Systems, Radiology Report, Lumbosacral Spine, Tr. 179**
IMPRESSION:
1.  AP, lateral, and coned views of the lumbosacral spine.
2.  Post fusion at L5 -S1 with bilateral pars defect and grade 1 anterolisthesis of L5 on S1.

**William Fremouw, Ph.D., Consultative Psychological Evaluation, 12/27/01, Tr. 290-295**

| IQ Scale: | Score: |
|---|---|
| Verbal scale IQ: | 96 |
| Performance scale IQ: | 90 |
| Full Scale IQ: | 94 |

DIAGNOSTIC IMPRESSION:

| AXIS I: | 309.81 | Posttraumatic stress disorder |
|---|---|---|
|  | 296.90 | Pain disorder associated with both psychological factors (PTSD) and a general medical condition |
| AXIS II: | No diagnosis | |
| AXIS III: | Post status spinal fusion | |
| PROGNOSIS: | Guarded | |

**Physical Residual Functional Capacity Assessment, 2/22/01-7/24/01, Tr. 296-304**
Primary Diagnosis: Lumbar Disc Disease

EXERTIONAL LIMITATIONS:

1.  Occasionally lift and/or carry (including upward pulling)
    (maximum)–when less than one-thirds of the time or less
    than 10 pounds:
    20 pounds
2.  Frequently lift and/or carry (including upward pulling)
    (maximum)–when less than one-thirds of the time or less
    than 10 pounds:
    10 pounds
3.  Strand or walk (with normal breaks) for a total of:
    about 6 hours in an 8-hour workday
4.  Sit (with normal breaks) for a total of:
    about 6 hours **in** an 8-hour workday
5.  Push and/or pull (including operation of hand and/or foot controls):
    unlimited, other than as shown for lift and/or carry

POSTURAL LIMITATIONS: none established.

MANIPULATIVE LIMITATIONS: none established.

VISUAL LIMITATIONS: none established.

COMMUNICATIVE LIMITATIONS: none established**.**

ENVIRONMENTAL LIMITATIONS: none established.

**Physical Residual Functional Capacity Assessment,1/2/02, Tr. 305-312**
Primary Diagnosis: s/p Lumbar Disc Disease

EXERTIONAL LIMITATIONS:

1.  Occasionally lift and/or carry (including upward pulling)
    (maximum)–when less than one-thirds of the time or less
    than 10 pounds:
    50 pounds
2.  Frequently lift and/or carry (including upward pulling)
    (maximum)–when less than one-thirds of the time or less
    than 10 pounds:
    25 pounds
3.  Strand or walk (with normal breaks) for a total of:
    about 6 hours in an 8-hour workday
4.  Sit (with normal breaks) for a total of:
    about 6 hours in an 8-hour workday

     5.       Push and/or pull (including operation of hand and/or foot controls):
                unlimited, other than as shown for lift and/or carry

POSTURAL LIMITATIONS: none established.

MANIPULATIVE LIMITATIONS: none established.

VISUAL LIMITATIONS: none established.

COMMUNICATIVE LIMITATIONS: none established.

ENVIRONMENTAL LIMITATIONS: none established.

**Mental Residual Functioning Capacity Assessment, Frank D. Roman, M.D. 1/22/02, Tr. 314-317**

UNDERSTANDING AND MEMORY:
1. The ability to remember locations and work-like procedures, Not significantly limited.
2. The ability to understand and remember very short and simple instructions, Not significantly limited.
3. The ability to understand and remember detailed instructions, Not significantly limited.

SUSTAINED CONCENTRATION AND PERSISTENCE:
4. The ability to carry out very short and simple instructions, Not significantly limited.
5. The ability to carry out detailed instructions, Moderately Limited.
6. The ability to maintain attention and concentration for extended periods, Moderately Limited.
7. The ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, Not significantly limited.
8. The ability to sustain an ordinary routine without special supervision, Not significantly limited.
9. The ability to work in coordination with or proximity to others without being distracted by them, No evidence of limitation in this category
10. The ability to make simple work-related decisions, Not significantly limited.
11. The ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, Moderately limited.

SOCIAL INTERACTION
12. The ability to interact appropriately with the general public, Not significantly limited.

13.    The ability to ask simple questions or request assistance, Not significantly limited.
14.    The ability to accept instructions and respond appropriately to criticism from supervisors, Moderately limited.
15.    The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, No evidence of limitation in this category.
16.    The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, Not significantly limited.

ADAPTATION
17.    The ability to respond appropriately to changes in the work setting, Not significantly limited.
18.    The ability to be aware of normal hazards and take appropriate precaution, Not significantly limited.
19.    The ability to travel in unfamiliar places or use public transportation, No evidence of Limitation in this category.
20.    The ability to set realistic goals or make plans independently of others, No evidence of Limitation in this category.

**Psychiatric Review Technique, Frank D. Roman, M..D., 1/22/02, Tr. 318-331**
I.      Medical Disposition(s):
            RFC Assessment necessary
        Category(ies) Upon Which the Medical Disposition is based:
            Affective Disorders
            Anxiety-Related Disorders
II.     Affective Disorders–A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above.

            Disorder: Illegible

        Anxiety-Related Disorders

            Anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by at least one of the following: Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress.
III.    Restriction of Activities of Daily Living, Mild.

        Difficulties in Maintaining Social Functioning, Moderate

        Difficulties in Maintaining Concentration, Persistence or Pace, Mild

        Episodes of Decompensation, Each of Extended Duration, None

**Physical Residual Functioning Capacity Assessment, Fulvio Franyutti, M.D., 7/24/02, Tr.**

**332-340**

Primary Diagnosis: LBPnsyndrome, s/p Lumbar Fusion, [Illegible] (7/24/02)

EXERTIONAL LIMITATIONS:
1. Occasionally lift and/or carry (including upward pulling) (maximum)–when less than one-thirds of the time or less than 10 pounds:
   50 pounds
2. Frequently lift and/or carry (including upward pulling) (maximum)–when less than one-thirds of the time or less than 10 pounds:
   25 pounds
3. Stand or walk (with normal breaks) for a total of:
   about 6 hours in an 8-hour workday
4. Sit (with normal breaks) for a total of:
   about 6 hours in an 8-hour workday
5. Push and/or pull (including operation of hand and/or foot controls):
   unlimited, other than as shown for lift and/or carry

POSTURAL LIMITATIONS: none established.

MANIPULATIVE LIMITATIONS: none established.

VISUAL LIMITATIONS: none established.

COMMUNICATIVE LIMITATIONS: none established.

ENVIRONMENTAL LIMITATIONS:

Extreme cold: avoid concentrated exposure

Extreme heat: avoid concentrated exposure

Wetness: unlimited

Humidity: unlimited

Noise: unlimited

Vibration: unlimited

Fumes, odors, dusts, gases, poor ventilation: unlimited

Hazards: unlimited

**Department of Veterans Affairs, Nursing Care Referral Form, 10/16/01, Tr. 367**

MEDICAL DIAGNOSIS, PROGNOSIS, AND PLAN FOR MEDICAL FOLLOW-UP:

 LBP, s/p lumbar fusion, unable to fully extend Rt. or Lt. knee

 c/o includes LBP and hemstring tightness.


**Pittsburgh VA Hospital, Marilou Bossio, M.D., 5/7/2002, Tr. 368-371**

IMPRESSION AND PLAN:

1.  Mechanical low back pain, status post L5-S1 posterior lumbar interbody fusion with pedicle screws.
2.  Myofascial low back pain due to deconditioning.
3.  Rule out bilateral sacroiliitis.
4.  Neuropathic left greater than right lower extremity pain.
5.  Obesity.
6.  History of alcohol abuse.
7.  Remote history of illicit drug use.


**Lumbar Myelogram, S & I, 7/30/2002, Tr. 373**

IMPRESSION:

 1.  Normal postoperative myologram.

 2.  Status post L5-S1 fusion and laminectomy at L5.

 3.  A mild spondylolisthesis at L5-S1 is present.


**ClarksburgVeteran's Administration Medical Center, John A. Lucci, 7/10/2002, Tr. 376**

ASSESSMENT:

1.  Chronic low back pain, failed syndrome.
2.  Chronic bilateral sacroilitis.


**ClarksburgVeteran's Administration Medical Center, Clinic Note, 5/16/2002, Tr. 382**

ASSESSMENT:

1.  Atypical chest pain.
2.  Chronic pain.
3.  Dyslipidemia.
4.  Hypertension.

**ClarksburgVeteran's Administration Medical Center, Medical Certificate, 2/8/2002, Tr. 384**

DIAGNOSTIC IMPRESSION:  Atypical chest pain


**Radiology Diagnosti Report, femur, 7/2/02, Tr. 395**

IMPRESSION:

 The visualized right femur appear [sic] unremarkable. No evidence of fracture or dislocation. No evidence of osteoblastic or osteolytic change. There appears [sic] to be "wires" in the projection of the right hip, the exact nature of which cannot be ascertained.

No significant abnormality, right femur.

**Radiology Diagnostic Report, Tibia and Fibula, 7/2/2002, Tr. 396**
IMPRESSION:

The visualized right tibia and fibula show no evidence of fracture or dislocation. There is slight spurring of the posterior/superior portion of the patella as noted on the lateral view suggesting mild degenerative joint disease of the right knee.

No significant abnormality, right tibia and fibula.

**Radiology Diagnostic Report, Shoulder, 7/2/2002, Tr. 397**
IMPRESSION:

Examination of the right shoulder shows degenerative joint disease with hypertrophic spurring of the inferior articulating surfaces of the humeral head and right glenoid. There is no fracture or dislocation. There is a partially threaded screw in the projection of the coracoid process of the right scapula (for muscle tendon fixation?) Clinical history suggested.

Abnormality.

**Radiology Diagnostic Report, Chest, 7/2/2002, Tr. 398**
IMPRESSION:

Comparing with the previous examination of 2/8/02, the present examination now shows clear lung fields. There appears to be partially threaded screw in the projection of the coracoid process of the proximal right scapula. The heart may be slightly enlarged. There appears to be discoid atelectasis in the lower lung field anteriorly seen only on the lateral view and ont he PA view may be on the right side medially.

Abnormality.

**Radiology Diagnostic Report, Stress test, 7/2/2002, Tr. 400**
REPORT:

Patient was infused according to Persantine protocol for 4 minutes. He achieved a work level of 1 MET. Resting HR was 97, which rose to a HR of 113, which represented 62% of his maximal aged predicted rate. Resting BP was 160/101, which rose to a maximum 160/101. Exercise test was stopped due to completion of the protocol.

The patient had no chest pain, SOB, or palpitations. Resting EKG was normal. Functional capacity could nor be assessed. There was no chest pain noted. No ST changes were noted except for some minor nonspecific changes in the inferior leads.

IMPRESSION:

Essentially negative exercise portion of Persantine/Cardiolite stress test. Imaging per Radiology and needs to be correlated.

Abnormality.

**Radiology Diagnostic Report, Stress test, 2/14/2002, Tr. 402**
IMPRESSION:

Patient was scheduled for a regular stress test; however, at starting the stress test, the patient could not exercise.  He described low back pain and was unable to walk for any appreciable length of time.  In fact, he walked for 1 minute and the test had to be discontinued.  Was discussed with primary care physician.  Will reschedule after Persantine/Cardiolite.

**Radiology Diagnostic Report, Chest Single View, 2/9/2002, Tr. 403**
IMPRESSION:

Slightly under exposed chest film.  No active disease.  Recommend repeat exam with optimal technique.

**Joseph Snead, M.D., 8/1/2002, Tr. 410-413**
DIAGNOSES:
1. Residuals of Bankart repair of the right shoulder for chronic dislocation with some loss of motion.
2. Numbness in the right arm which may be due to a soft cervical disc.
3. Osteoarthritis of the cervical spine by history.
4. Spondylolisthesis of the lumbar spine, status post operative L5-S1 fusion.
5. Bilateral mild knee osteoarthritis.

**Clarksburg Veteran's Administration Medical Center, John A. Lucci, 11/15/2002, Tr. 414**
ASSESSMENT:
1. Chronic low back pain, failed back syndrome.
2. Chronic bilateral sacroiliitis.

**Alison Peterson, M.D., EMG Consultation Report, 5/23/03, Tr. 416**
IMPRESSION:

This EMG/NCS shows several chronic changes which are consistent with a radicular process involving bilateral S1 and the left L4 myotomes.  Note that there are no acute changes and that the findings seen are chronic and may be residual and may not have reverted back to normal, despite successful surgery.

**Magnetic Resonance Study, Lumbar Spine, 5/23/2003, Tr. 418**
IMPRESSION:

Degenerative changes and grade I anterolisthesis of L5 and S1 which was present on the prior outside study from February 13, 2000.  The present examination demonstrates pedicle screws bilaterally at L5 and S1 which are new since the prior study.
The neural foramina are essentially clear towards the lumbar spine bilaterally with the exception of minimal narrowing at the L5-S-1 level medially.

D.      Testimonial Evidence

## 1. Claimant

Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 420-450):

Q       Okay.  What happened after the surgery?

A       Well, we thought everything went good.  Was feeling pretty good until around September.  Then I started getting these leg things happening where it was shooting pain down, so I went back and I told him about it.  And he said, well, that was pretty normal.  Give it a chance to heal.  So we did, and nothing seemed to get any better.  So we went back and we talked - - he had rotated.  The guy who did the surgery rotated, and so I talked to a different doctor and he sent me to do some tests.  And he told me there's nothing that he could find a reason for anything happening to me.  He said there's nothing anatomically wrong with you.  I can't tell you why you're doing what you're doing.

Q       And what were you - - what is it that you were doing that they were testing for?

A       Well, I had like somebody took a hot knitting needle on the side of my leg and just shot it right down to the knee on both legs, and both legs are numb still like on the outside of the thighs.  And I get shaky and I don't know why.

*                    *                    *

Q       Do you have problems with your memory?

A       Yes, sir.

Q       Like what?

A       Well, I can't concentrate on nothing.

Q	How long has that been the case?

A	Oh, pretty much since September of 2001.

Q	What happened in September of - - that's when these pains came - -

A	That's when these pains got so bad.

*   *   *

Q	Can you still drive?

A	I try.  I really do, I try, but it's getting to where I can't.  Pushing on the brake pedals, it moves wrong or something.  I don't know, but it's getting worse.

Q	And you said you cut down on grocery shopping because you can't do it that well?

A	Yes, sir.

*   *   *

Q	Have you gotten any treatment for any kind of a mental impairment?  Depression, or nerves, or anything?

A	Yes, sir.  I went and seen one, the VA guy, and he gave me Zoloft.

Q	Are you taking that?

A	On and off.

*   *   *

A	I used to have good days.  I mean, if I did something stupid, I'd have a bad day maybe three days afterwards.  But now if I get a good day, I don't remember one.  I haven't had a good day in I don't know how long.

Q	All right.  When you say good day, what - -

A        I mean, not pain-free, because I haven't been like that for a really long time.  I think the last time I was completely pain-free it lasted for seven hours, and it was because that one doctor gave me a shot in the back.  But I used to be able to go grocery shopping.  I used to be able to take care of the checkbook and everything, no problem.  And I just can't do it anymore.

Q        All right.  Before the surgery in early 2001 when you had come here, in an average week about how many good days might you have?

A        Before the surgery I'd probably have maybe one or two a week, easy.

Q        And since the surgery?

A        Three or four a month.

Q        So maybe one a week?

A        Maybe one a week, maybe.  I mean, it doesn't - - I don't know.  It doesn't run like - - you know, I can't - - if it's going to rain, I'm going to have a bad day.  I don't know, I'm sorry.  I don't understand.

Q        All right.  Tell us what a bad day means for you.

A        A bad day is I can't get out of bed.  I got to work to get out of bed.  I don't eat breakfast because I can't.  My stomach's upset and I'm nauseous.  I take my meds.  I get in the chair and I'll probably take a nap.  And I don't really get out of that chair unless it's to fill my water or something like that, something that I can - - you know, something that I can do.  I probably don't get out of the chair maybe 15, 20 minutes out of the whole day.

Q        And since the surgery - - I mean, you had physical therapy after the surgery.  I mean, did that help you at all?

A       Yes, ma'am.  I think - - I got my foot back.

Q       Other than the foot?

A       No, no.  Nothing else happened.  Just more pain.  I mean, everything they wanted me to do hurt.  And I tried to do it, I really did.  And that's when they told me, you know - - well, they sent me home a couple times because I was trying too hard, I think.

*       *       *

Q       All right.  You talked about taking naps on the bad days.  Do you sleep or are you just dozing, or do you know?

A       I just doze.  I'm not really - - I close my eyes and I try to just zone out.  I don't know how to describe it.  Like a catnap.  Maybe a half hour at the most.

Q       And do you do that more than once a day?

A       Maybe three times a day.

Q       All right, when you're standing - - I mean, when you've been standing now every time that I can remember, that I've observed, you know, you've had your hand on the table, at least one of them.  Can you stand without supporting yourself?

A       No.  I get too shaky.

Q       All right.  And the shaking that you have and so forth, is this representative of what you're like on a daily basis, or - -

A       Yes, ma'am.  Yes, ma'am.

Q       Can you ever stand without - - I mean, freely, without supporting yourself in some way, or do you?

A       I try not to.

Q       When you walk, you don't use a cane or anything?

A       No, ma'am.

Q       Is there any reason?  Has anybody said anything about that?

A       No.  No one's ever said anything about it.  I usually got Kathy close to me here, one of the kids close to me, to help me.

Q       What, if any, I mean, child care do you do now?  At one point you were full time taking care of a small child, right?

A       Yes, ma'am.

Q       All right.  At this point in time, what - -

A       I don't have the patience.  I try not to.  I get too aggravated at them.  I get short-tempered with them.

Q       Do you get violent?

A       No, I don't get violent.  I mean, I'll holler at them, but I don't cuss them out or beat them over the head or anything.  I just try to correct them, you know.

*         *         *

Q       All right.  Do you drive longer distances at times?

A       I can't.

*         *         *

Q       What about bending?

A       I don't do that.  I don't do anything over - - like if I'm getting something out of the refrigerator, I can't get anything past the first shelf.  If it's on the second shelf, I got to call somebody to help me

<u>2.  Claimant's Wife</u>

Testimony was taken at the hearing from Claimant's wife, who testified as follows (Tr. 450-456):

Q        All right.  And what, if any, change did you notice at that time with regard to his abilities and so forth?

A        When they sent him - - he'd been having problems prior to that.  But the day they sent him home from work he was barely able to move.  We took him to the emergency room.  From then on things just got worse, and he was going to have back surgery.  Dr. Goobda [phonetic] was going to do it in Michigan.  And then due to circumstances beyond our control we had to leave Michigan, and that was in the first of April.  And he had surgery here in July.  Actually, in Pittsburgh in July.  And thought he was doing okay until about September, and then he started having really bad pain in his legs like they were on fire.  He had problems walking.  He got very, very despondent, very, very hateful.  No patience at all with the children or myself.  Wasn't a whole lot he could do in the house.  He can't vacuum.  You know, he can't do dishes.  He can't do laundry.  You know, so everything was basically left up to us.  And his life, he had just changed.  It went from a happy man that we did all these things together, to somebody that couldn't wake up without pain.

*               *               *

Q        What about going out, you know, in public?  Say, going shopping, malls, church, anything?

A        We can't go to - - he doesn't go to church anymore because he can't sit in the pew.  To go shopping with him, I prefer to leave him at home because he's ready to go before we

18

get in the door.  He can't walk through the store.  When he goes into the store, he has to have the cart.  And I mean, 15 minutes tops is all he can stand it in the store, so normally I try to just leave him at home.  But he's - - we don't go out with friends.  We don't do anything that we used to do.  We just stay at home.

Q     All right.  You're observing his, I mean, tremors and so forth standing.  Is this something that you would see on a weekly basis, this kind of - -

A     Oh, I see this daily.

### 3. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr. 456-469):

Q     Okay, let me give you a hypothetical question.  If we assume person of the same age, education, and work experience as the Claimant.  And assume a hypothetical person who could do light work as that's defined in the Commissioner's regulations, but there would be additional limitations that have to be factored in.  Have to be - - person should have to change positions briefly at least every half hour.  And by brief, I mean for a minute or two.  So if they're standing, they'd have to be able to sit at least every half hour.  Conversely, if they're sitting, they'd have to be able to stand.  Job should not involve any exposure to concentrated heat or cold.  No climbing ladders, ropes, or scaffolds.  No more than occasional stairs or ramps.  No kneeling or crawling.  And no more than occasional balancing, stooping, or crouching.  The job should not involve detailed or complex instructions.  No close concentration or attention to detail for extended periods.  The job should not be fast-paced or in connection with an assembly line.  And the job should have no close interaction with supervisors.  Should be only, at most, one- to

two-step directions in a law-stress setting.  Would there be any jobs such a person could do at the light or sedentary level?

A        Yes, Your Honor.  There would be the work of a hand packer.  In the local economy there would be 141 jobs classified as light, and in the national economy 215,300 jobs classified as light.

Q        215 - -

A        Thousand.

Q        - - 300?

A        300 jobs.  There would be the work of a security guard but it would be the surveillance equipment monitor, and that job would be classified as light - - excuse me - - sedentary.

Q        I was going to say, yeah, that - -

A        Sedentary.  And in the local economy there are eight jobs.  In the national economy 5,460 jobs.  There would be the work of a mail clerk, and that would be in private industry as opposed to working of the Postal Service.  And there would be 39 jobs classified as light in the local economy, and 51,300 jobs classified as light in the national economy.  Those are examples of jobs, Your Honor.

Q        Are there any others?  I mean, that's only three.

A        There'd be the work of a library clerk.

Q        Is that a light or sedentary?

A        There would be 32 jobs classified as light and none as sedentary.  And 33,200 jobs classified as light in the national economy.

Q        Okay.

A        There would be the work of an information clerk.  In the local economy there would be 14 jobs classified as light, and 15 jobs classified as sedentary.  In the - - that would be in the local economy.  And in the national economy there would be 14,900 jobs classified as light, and 15,500 jobs classified as sedentary.

Q        Any more?  I mean, the numbers are kind of small.  That's why if there's any more, I want you to keep going.

A        He resides in West Virginia, Your Honor.

Q        Well, I know.  Yeah, you don't need to keep your - - you know, with West Virginia people, you don't need to keep your area in West Virginia.  You can go to Western Maryland or Southwest Pennsylvania, you know, as long as it's not too far away from where they live.

A        I just have the statistics for West Virginia, Your Honor.

Q        Well, that's okay, but you know, in the future.  Is there anything else that comes to mind?

A        There's nothing else that comes to mind, Your Honor, that would be within the hypothetical restrictions as you indicated.

Q        Okay.  And I take it if somebody had to lay down during the day, there'd be no jobs if they had to lay down more than a half an hour a day?

A        That is correct, Your Honor.

Q        How many days a month could a person miss work, if any, and still be able to do these jobs?

A       Well, in my experience, an individual could miss two days a month and not really be in jeopardy of losing their job.  Three days or more, that becomes problematic in keeping the job.

ALJ     Okay.  Go ahead, Ms. Rehmann.

ATTY On the judge's first question there, if the individual really needs to be able to support himself with at least one hand, would that change your answer to that question?

VE      Yes, I - - well, let me see.  I believe it would impact on the ability to work on a job as a packer, because standing and leaning on one's hand would preclude working and that individual would be off task.  I believe this individual could still work as a surveillance equipment monitor with that restriction.  The mail clerk, if the individual - - if the standing and the sitting requirement is not in synch with doing the job, then it could be a problem and probably preclude working as a mail clerk.  Similarly, the library clerk - - that would preclude that kind of work.  I don't believe it would adversely affect the ability to work as an information clerk.

BY ADMINISTRATIVE LAW JUDGE:

Q       Well, can you kind of elucidate what you mean by, if the standing and sitting is not in synch with the job?

A       Well, for example, the mail clerk, that job - - some of the work is done sitting down sorting the mail, putting it in packets, or figuring out the route the person's going to take throughout the building or amongst buildings.  If the job is requiring the person to sit and sustain an effort for a period of time more than the requirement to stand up, then that starts impacting on the person's ability to do the job.  So if the standing and sitting requirement is - - if the person

can still do the job while either standing or sitting, then generally that job could still be performed. But if it's mostly done while sitting or mostly done standing, and then the requirement is out of synch with that, they it could be a problem as far as maintaining the level of productivity required.

Q        Okay. I'm not sure that I understand yet.

A        Okay.

Q        It's a light job, but you indicate that it could be done standing or sitting or - - I'm sorry. How is it determined whether it's in synch with the job? What determines that?

A        What determines what the requirement of the job is?

Q        Yeah, I guess may be that would be - -

A        Okay. Well, the - - what the employer is - - what - - let me see. How the job is being performed in the context of the employment. If it's, for example - - let's say the packer's job. The product might be fairly small and light, but it's just a lot easier to do a certain part of the job standing, like putting the packaged item into a box and putting a number of them in. But when the individual has to then maybe tape the box or put a label on it or something like that, it can be done perhaps sitting or - - so the job may be packing a bunch of boxes for maybe two hours until the first break. Then the person takes a break. Then after the break, they label all the packages. So that means that the person's probably standing for the first two hours of the shift. Then they take a break, and then maybe the next period the individual might sit down for awhile. Well, if during the two hours where the person is required to stand and pack, and that individual needs to sit to take a break, and it's going to be an extended period of time where a person's off task, and then it becomes a problem performing that job.

23

Q       Okay, okay, well I - - now I'm really confused.  The original part of the hypothetical as that they'd have to be able to change position briefly for a minute or two every half hour.

A       Yes.

Q       Okay, so how - - so they couldn't sit for two hours straight?

A       Well, the difference between the initial hypothetical was that the change would only last for a minute.

Q       Right, a minute.  Right, right.

A       Whereas Ms. Rehmann's hypothetical was that the individual would have to stand - -

Q       Every 10 or 15 minutes.

A       - - for - - but for 50 percent of the time.

Q       Fifty - - well, wait a minute.  No, wait, wait.

A       So almost stand - -

Q       Wait.  For 50 percent of the time for when standing - -

A       Okay, that's right, yeah.

Q       No, no.  Not - - they wouldn't have to stand for 50 percent of the time, but whenever they stand for 50 percent of the time, they needed one hand to support them.  They needed to put a hand on the table or something.  They need to - - as I understood it, change of position every 10 or 15 minutes.  And when standing needs - -

A       Have to lean on something.

Q       Have to lean on something.

A         Okay, maybe I understood.

ALJ          Now Ms. Rehmann, do you want to - -

ATTY         That was what I asked, yes.

VE           That when one - - when the individual - -

ATTY         The frequency - - I mean, the frequency of changing position, you know, was less - - 15 - - 10 to 15 minutes.  And - -

ALJ          Was actually more.

VE           Well, the frequency is more but, yes, it's less than a half hour.

ATTY         Well, the intervals.

VE           Yes.

ATTY         And that when standing, the individual required at least one hand to support himself with on a table or chair or something.

VE           Okay, I understood that.  And then you said 50 percent - -

ATTY         That 50 percent of the time he had to support himself.

ALJ          Fifty percent of the time when he's standing, he has to use one hand to support.

VE           Oh, okay.  Well, that changes my testimony.  It would not impact on the numbers of jobs because it would be very similar to the judge's original hypothetical.  Because it doesn't matter what the person is doing while they're standing for that one minute.  I don't think that would preclude employment.

ATTY         All right, I'm not saying they're standing for one minute.  I said they're changing position.  It may be as much as 15 minutes.

VE                The person would be standing for 15 minutes?

ATTY           Standing, yes.

ALJ             Yeah, I think you need to - - actually, I do think you need to be a little

more explicit in - -

VE                Okay.

ALJ             No, not you.

ATTY           Well - -

ALJ             Ms. Rehmann, I think you need to be a little more explicit in how much

standing and sitting, yeah.

ATTY           Between sitting and standing, the person needs to change positions at least

every 10 to 15 minutes. And standing is as bad as sitting, and so the period of standing can be

up to 10 to 15 minutes. The period of sitting can be up to 10 to 15 minutes. But at least half the

time while he is standing he needs to have some support to stabilize himself.

VE                Okay, I think - - yeah, let me see. First of all, if the person is required to

change positions at least half of the time they're on the - - on task during a workday, then when

the person is in the - - had change of position from standing or sitting, or sitting to standing, that

goes to what I was saying earlier, that if the job itself as it's required to be performed is not in

synchronization or consistent with the need to stand or sit, then it adversely affects the person's

ability to perform the job as it's required, and most likely would preclude performing most jobs,

actually. The only job I could think of where you could either stand or sit and watch would be

the surveillance equipment monitor, and that - - and whether he's supporting himself standing or

changing positions, irrespective of when the change has to occur, that job could still be

performed because that person is observing the monitor.  So that's one answer to that hypothetical.  As far as information clerk, as I understand how that job is generally performed, it can also be - - but actually, being - - if the person's required to support themself while standing from a sitting position, that probably would adversely affect being able to input information and use the computer like they generally do in performing that job.  So I think it would harm an individual in the ability to perform the work as an information clerk.  The work of a library clerk, I believe that job could still be - - could accommodate those limitations.  I still think it could be performed because the job is standing and sitting, and filling books, and you know - - yes, I still believe that that job could be performed, and it would be within the restrictions of the judge's hypothetical.

ALJ          Ms. Rehmann - -

VE          The work of a packer would be adversely affected, because if the person's standing and leaning on something, they could not be packing and doing certain aspects of the job.  Is there any other job that I haven't addressed?

ALJ          Mail clerk.

ATTY          No.

VE          Mail clerk?  In my opinion it would - - your hypothetical would - - that individual restricted as such would be adversely affected in working as a mail clerk, because that job has certain requirements, and this is the concept if the stand - - need to stand and sit is not in synch with the job requirements of standing and sitting, then the person could really do it the way it's normally performed.

ATTY          All right.  And it's your testimony that the surveillance system monitor

27

and the library clerk do not require close concentration?

VE            As I understand the judge's hypothetical as far as close concentration, no. Because - -

ALJ           What I said was no close concentration or attention to detail - -

VE            For extended periods.

ALJ           - - for extended periods.

VE            Right.

E.    Lifestyle Evidence

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how Claimant's alleged impairments affect his daily life.

•      Claimant has a driver's license and is able to drive short distances. (Tr. 428, 439, 449 ).

•      He has a history of drug and alcohol abuse. (Tr. 368-371).

•      Smokes one to two packs of cigarettes a day. (Tr. 167).

•      Able to stand for ten minutes.  (Tr. 429).

•      Does not use a cane while walking. (Tr. 448, 455-456).

•      Watches television. (Tr. 440).

•      Plays video games. (Tr. 440).

•      Occasionally plays board games with his children. (Tr. 452).

•      Lays down for fifteen to thirty minutes several times a day.  (Tr. 440, 455).

•      Does the dishes.  (Tr. 438).

## III.  The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that: (1) the Appeals Counsel erred because it failed to give reasons for findings that additional evidence did not justify further administrative action; and (2) the ALJ's finding that plaintiff was not credible is not supported by substantial evidence.   In the alternative, Claimant requests that the decision of the Commissioner be vacated and the matter be remanded for a hearing *de novo.*

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the Appeals Counsel properly reviewed the evidence, and adequately explained why it found that the subsequent  evidence did not require further administrative action.  Additionally, Commissioner assets that the ALJ properly assessed Claimant's credibility.

B.    <u>The Standards</u>.

1.    <u>Summary Judgment</u>.   Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion. <u>Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue

for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.      Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.  Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his

rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.    Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.    Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).


10.  Appeals Council's Review of New Evidence.  The Fourth Circuit Court of Appeals has decided albeit in unpublished opinions that the Appeals Council does not need to engage in a detailed analysis of new evidence.  Freeman v. Halter, No. 00-2471, 2001 WL 847978, at *2 (4th Cir. July 27, 2001); Hollar v. Comm'r, No. 98-2748, 1999 WL 753999, at *2 (4th Cir. Sept. 23, 1999).

11. <u>Social Security - New and Material Evidence - Appeals Council</u>. Evidence is not "new" if other evidence specifically addresses the issue. <u>Wilkins v. Sec'y, Dep't of Health and Human Servs.</u>, 953 F.2d 93, 96 (4th Cir. 1991). Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome. <u>Id.</u>

12. <u>Social Security - New Evidence - Power to Remand</u>. The Court may remand a case to the Commissioner "only upon a showing that there is new evidence, which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."

14. <u>Social Security - New Evidence -Remand - Burden on Claimant</u>. "A claimant seeking remand on the basis of new evidence under 42 U.S.C. § 405(g) must show that the evidence is new and material and must establish good cause for failing to present the evidence earlier. <u>Wilkins v. Sec'y, Dep't of Health and Human Servs.</u>, 953 F.2d 93, 96 (4th Cir. 1991) (en banc).

15. <u>Social Security - Claimant's Credibility</u>. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." <u>Shively v. Heckler</u>, 739 F.2d 987, 889 (4th Cir. 1984) citing <u>Tyler v. Weinberger</u>, 409 F. Supp. 776 (E.D. Va. 1976). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference. <u>See</u> <u>Nelson v. Apfel</u>, 131 F.3d 1228, 1237 (7th Cir. 1997). We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong'" <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000) citing <u>Herr v. Sullivan</u>, 912 F.2d 178, 181 (7th Cir. 1990).

C.    <u>Discussion</u>

1.    <u>Failure of Appeals Council to Explain its Consideration of Additional Evidence</u>

Claimant asserts that the Appeals Council erred when it failed to explained its treatment of new evidence submitted to the Appeals Council following the ALJ's decision. Commissioner counters that the Appeals Council adequately explained its reviews of these records.

Claimant contends that Dr. Snead's "conclusions were unhesitating and conclusive as regards his disability for VA purposes" and that the additional records supported a finding that Claimant met or equaled a musculoskeletal Listing that "should have alerted the AC to significant evidence." Pl.'s Br. at 9-10. Claimant further requests that the Court reverse the decision of the Commissioner or, in the alternative, remand this case for a hearing de novo. Commissioner counters that the Appeal Council adequately explained its review of these records. Additionally, Commissioner states that the additional evidence provided by Claimant is not new and would not have changed the AJL's decision.

There is a difference of opinion among courts as to whether or not the Appeals Council must articulate its assessment of new evidence. Some courts find that the Appeals Council is not obligated to discuss its treatment of additional evidence submitted after the ALJ issues its decision. See Browning v. Sullivan, 958 F.2d 822 (8th Cir. 1992)(the language of the regulations does not require the Appeals Council to articulate its consideration of new evidence). The court in Browning further noted that, when the Appeals Council denies review, the regulations allow the reviewing court review only the actions of the ALJ. Id. at 822-23. On the other hand, a number of courts have recently found that an explanation from the Appeals Council is necessary for a reviewing court to properly perform its statutory function. See Hawker v. Barnhart, 235 F. Supp.2d 869, 873 (D.S.C.2000); Riley v. Apfel, 88 F.Supp.2d 572, 579 (W.D.Va. 2000). These courts assert that a reviewing court cannot properly review an administrative record without an

understanding of the weight assigned to all evidence. <u>Hawker</u>, 235 F.Supp.2d at 449. The

Fourth Circuit Court of Appeals has decided, albeit in unpublished opinions, that the Appeals

Council does not need to engage in a detailed analysis of new evidence. <u>Freeman v. Halter</u>, No.

00-2471, 2001 WL 847978, at *2 (4th Cir. July 27, 2001); <u>Hollar v. Comm'r</u>, No. 98-2748, 1999

WL 753999, at *2 (4th Cir. Sept. 23, 1999).[6] Additionally, the court in <u>Ridings v. Apfel</u>, 76 F.

Supp.2d 707, 709 (W.D.Va. 1999), decided that the Appeals Council is not expressly required by

the regulations to state its rationale for denying review. <u>See</u> <u>also</u>, <u>Riley v. Apfel</u>, 88 F. Supp. 2d

572, 580 (W.D.Va. 2000)("I agree with Judge Jones, <u>see</u> <u>Ridings</u>, <u>supra</u>, that the regulations do

not explicitly require the Appeals Court to provide written findings with respect to any new

evidence and its impact in light of the overall record and that this facilitates orderly decision-

making withing the agency.")**.**

      In the present case, Claimant relies on <u>Strawls v. Califano</u>, 596 F.2d 1209 (4th Cir. 979),

and <u>DeLaotche v. Heckler</u>, 715 F.2d 148 (4th Cir. 1983), for the proposition that the

Commissioner is required to indicate the weight given to all relevant evidence. Claimant's

reliance is misplaced. Unlike the present case, the Appeals Council in <u>Stawls</u> granted the request

for review because the ALJ failed to articulate the bases for his conclusions. Likewise,

<u>DeLaotche v. Heckler</u>, 715 F.2d 148 (4th Cir. 1983), is distinguishable from the case at hand. In

<u>DeLoatche</u>, the court held that reversal of the district court's decision and remand was required in

a social security disability benefits proceeding where the administrative law judge failed to

consider a disability determination by the State of North Carolina. The court noted that the ALJ's

---

[6] U.S.Ct. of App. 4th Cir. Local Rule 36(b) provides that citation to unpublished
decisions is disfavored. Although I recognize that this case may not constitute precedential
value, I conclude, nevertheless, that its analysis is relevant to this issue before this court.

failure to make requisite findings or to articulate the bases for his conclusions make the court's task impossible. Here, there is no claim that the ALJ failed to adequately explain his findings.

Claimant also cites Alexander v. Apfel, 14 F.Supp.2d 839 (W.D.Va.1998), to suggest that the Appeals Council was required to state rationale for denying review. Claimant's argument that Alexander favors her positions is unconvincing. In Alexander, the Appeals Council considered new evidence offered by Claimant and concluded that it did not provide a basis for changing the ALJ's decision. Claimant argued that the Commissioner should be required to explain its reasoning for denying a request for review. The court decided that "if the Appeals Council ostensibly considers the new, 'interim' evidence in denying review of a claim, it is incumbent on the Appeals Council to give some reason for finding that the 'interim' evidence does not justify further administrative action." Alexander, 14 F.Supp.2d at 844. The court noted, however, that a remand to consider "interim" evidence is not necessary where it is clear upon review of such "interim" evidence that the Commissioner's underlying decision "is, or is not, supported by substantial evidence." Id. at 844, n.3. Additionally, as the court noted in Riley v. Apfel, 88 F.Supp.2d 572, 580 (W.D.Va.2000), such a remand is necessary where the additional evidence is "conflicting," or presents "material competing testimony." And, the court in Ridings, 76 F.Supp.2d at 710, noted that a remand is necessary where the additional evidence "calls into doubt any decision grounded in the prior medical reports." Here, by Claimant's own admission, the newly submitted evidence does not conflict with other evidence of record. Pl.'s Br. at 10. Therefore, the Undesigned rejects Claimant's arguments that this case should be remanded only because the Appeals Council failed to provide an explanation for its consideration of the additional evidence.

Thus, the task remaining for the court is to review the ALJ's decision "in light of evidence which the ALJ never considered, and thus never evaluated or explained," <u>Ridings</u>, 76 F.Supp.2d at 709, and to determine whether this additional evidence creates a "conflict," is contradictory, or "calls into doubt any decision grounded in the prior medical reports." If so, the case must be remanded to the Commissioner to weigh and resolve the conflicting evidence.[7]

The facts of this case do not warrant a remand. In this case, the Appeals Council stated that, after considering the additional evidence, it found no basis for changing the ALJ's decision. (Tr. 5). As discussed above, if the new evidence creates a "conflict," is contradictory, or "calls into doubts any decision grounded in the prior medical reports," the case must be remanded to the Commissioner. If not, the case can be decided on the existing record without the necessity of a remand.

A claimant seeking remand on the basis of new evidence must show that the evidence is new, material and relates to the period prior to the ALJ decision. <u>Wilkins v. Sec'y, Dep't of Health and Human Servs.</u>, 953 F.2d 93, 95 (4th Cir. 1991) (en banc). Evidence is "new" "if it is not duplicative or cumulative." <u>Id.</u> Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome. <u>Id.</u> Where the Appeals Council considered the new evidence, but denied review, as in this case, the Fourth Circuit requires that reviewing courts consider the record as a whole, including the new evidence, in order to determine whether the decision of the ALJ is supported by substantial evidence. <u>Id</u>. at 96. As was discussed above, duplicative or cumilative evidence will not meet the test for remand under <u>Riley</u>, <u>Ridings</u>, and

---

[7] This approach is consistent with the court's opinion in <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990), holding that it is the duty of the ALJ, not a reviewing court, to resolve conflicts in the evidence.

footnote 3 of <u>Alexander</u>.

The evidence submitted to the Appeals Council does not change the weight of evidence supporting the Commissioner's decision. Dr. Snead's report, dated August 1, 2002, is not new evidence and, therefore, is not grounds for a remand. A review of the records reveals that many of Dr. Snead's findings were previously addressed in the evidence submitted to the ALJ. In his report, Dr. Snead diagnosed spondylolisthesis of the lumbar spine, which was previously diagnosed on November 21, 2001. (Tr. 412, 373). Additionally, Dr. Snead noted that Claimant had a reduced range of motion in his lumbar spine, which was previously noted by Dr. Lucci in his July 10, 2002 report. (Tr. 412, 376). Dr. Snead also noted that Claimant had no weakness or paralysis in his lower extremity muscles. (Tr. 412). With regard to Claimant's range of motion in his cervical spine, a "slight" reduction was noted. (Tr. 412-413). Dr. Snead further noted that the Claimant has some loss of motion in his right shoulder; however, he opined that Claimant had good grip strength and no ulnar deficit in his right hand. (Tr. 412). This finding was reflected in the Claimant's X-ray, dated July 2, 2002, which demonstrated degenerative joint disease with hypertrophic spurring in the right shoulder. Therefore, Dr. Snead's report, dated August 1, 2002, which was considered by the Appeals Council, is not grounds for a remand.

Additionally, Claimant's VA records submitted to the Appeals Council do not provide any different objective information as to Claimant's condition than the information already considered by the ALJ. In his notes, dated November 27, 2002, Dr. Lucci opined that Claimant's physical examination was essentially unchanged from his prior examination in July, 2001. (Tr. 414-415). On April 7, 2003, Dr. Lucci again noted that Claimant's examination was essentially unchanged from his prior examination. (Tr. 414). Dr. Lucci also noted that Claimant was "experiencing

significant pain," but he did not know its etiology. (Tr. 415). Claimant's MRI of his lumbar spine demonstrated degenerative changes and grade I anterolisthesis of L5 and S1, which were present on the prior study of February 13, 2000. (Tr. 419). Additionally, the neural foramina were essentially clear, and there was minimal narrowing of the L5-S1 level medially (Tr. 419). Claimant's additional medical records demonstrate no substantial change in Claimant's medical condition. Therefore, Claimant's VA records, which were considered by the Appeals Council, are not grounds for a remand.

The Appeals Council considered this additional evidence and concluded that the additional evidence was not grounds for changing the AJL's decision. A review of the record indicates that the decision by the Commissioner is supported by substantial evidence. Therefore, because no detailed explanation is required when the Appeals Council merely acts to deny review, the Appeals Council did not err.

## 2. Credibility

Claimant asserts that the ALJ erred in determining his credibility. Commissioner counters that the ALJ properly determining Claimant's credibility.

Unfortunately for Claimant, his argument is without merit. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 889 (4th Cir. 1984)(citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). The ALJ must apply a two-step analysis when assessing the

credibility of a claimant's subjective complaints of pain. First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged. Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).

In this case the ALJ correctly applied the Craig test. The ALJ found that Claimant had "medically demonstrable severe impairments including a vertebrogenic impairment i.e., disc bulging and status post surgical fusion at the L5-S1 level and a traumatic stress disorder manifested by depression and anxiety" (Tr. 20). Although Claimant suffers from impairments that could cause some of the alleged symptoms, the ALJ found that the objective evidence did not support the alleged severity. (Tr. 21). This satisfies the first prong of Craig.

The ALJ considered Claimant's subjective complaints of pain in light of the entire record in accordance with the second prong of Craig. Claimant contends that the ALJ's observations of Claimant's behavior differed from those of his counsel and argues that it "seemed that the ALJ avoided looking directly at the claimant" (Pl.'s Br. at 12). The ALJ, who was in the best position to observe Claimant at the hearing, observed that "throughout the hearing, the claimant periodically arose from his seated position and throughout the proceedings visibly shook." (Tr. 18). The ALJ found this behavior questionable and noted that Claimant also had positive Waddell's signs (which suggested an exaggerated response to pain), when he was examined by Dr. Lucci on April 7, 2003. (Tr. 18, 376). Dr. Lucci also noted that Claimant's straight leg raises were "questionably positive" and he appeared to have an exaggerated response. (Tr. 376). Although Dr. Lucci stated that he believed that "the patient is experiencing significant pain," he

noted that he did "not know the etimology of this problem at this time other than he is post laminectomy and continues to have residual pain possibly related [to] post surgical changes" and that the "possibility does exist that he has some type of dorsal column lesion that might be causing his very unusual symptoms." (Tr. 415). A follow-up EMG test, dated May 23, 2003, demonstrated several chronic changes, but no acute changes. (Tr. 417). A follow-up MRI, dated May 23, 2003, was essentially unchanged from the February 13, 2000 MRI and demonstrated only minimal narrowing at the L5-S1 level medially. (Tr. 419).

The ALJ also noted that Claimant testified that after undergoing back surgery in July 2001, he felt better until September 2001, when he developed pains in his low back, which radiated to his legs. In this regard, the ALJ noted that Claimant's myelogram obtained on November 29, 2001, produced results consistent with Claimant's status post L5-S1 surgical fusion and laminectomy at the L5 level with mild spondylolisthesis, but essentially normal. (Tr. 18, 369). The ALJ also noted that, although Claimant ambulated slowly, he did not rely on a cane or other assistive device. (Tr. 18, 376-377). Claimant also asserts that the ALJ erred because he found that Claimant's pulmonary function test demonstrated "low effort," whereas the technician who conducted the test opined that Claimant's effort was "good" (Pl.'s Br. at 14, Tr. 393). Claimant also argues that several medical professionals and a Social Security Administration worker observed his difficulty ambulating. (Pl's Br. 12-13). However, having considered all the evidence in accordance with the second prong of Craig, the ALJ is in the best position to determine Claimant's credibility. Although the ALJ determined that Claimant had medically demonstrable severe impairments, including a vertebrogenic impairment, the ALJ also determined that Claimant's testimony was not fully credible and inconsistent with his medical record.

Therefore, the ALJ properly assessed Claimant's credibility.[8]

## IV. Recommendation

For the foregoing reasons, I recommend that Claimant's Motion for Summary Judgment

be DENIED and that the Commissioner's Motion for Summary Judgment be GRANTED because

the ALJ was substantially justified in his decision. Specifically, the Appeals Council adequately

explained why it found that the Dr. Joseph Snead's report and subsequent records from the VA

Hospital would not have changed the ALJ's decision. Additionally, Claimant's subsequent

evidence is not new and material. Finally, the ALJ properly assessed Claimant's credibility.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten

(10) days after being served with a copy of this Report and Recommendation, file with the Clerk

of the Court written objections identifying the portions of the Report and Recommendation to

which objection is made, and the basis for such objection. A copy of such objections should be

submitted to the District Court Judge of Record. Failure to timely file objections to the Report

---

[8] Claimant also alleges that his wife testified that his trembling is "a daily occurrence"; he had no "good days" in the previous six months; he takes several naps a day, from 15 to 30 minutes. (Tr. 454-455). Claimant contends that, because the ALJ made no reference to her testimony in his decision, her testimony is unchallenged and, therefore, credible. Although the ALJ is required to indicate the weight given to all relevant evidence, Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984), the Fourth Circuit does not require that the ALJ discuss every piece of evidence. The Undersigned further notes that the Seventh Circuit has held that a written evaluation of every piece of evidence is not required, as long as the ALJ articulates at some minimum level her analysis of a particular line of evidence. See Green V. Shalala, 51 F.3d 96, 101 (7th Cir.1995). Also, the Eighth Circuit has held that the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it. Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998). See also Walker v. Secretary of Health and Human Services, 884 F.2d 241, 245 (6th Cir.1989)(reviewing court many examine all the evidence, even if it has not been cited in the Secretary's decision). Therefore, this Court must examine the record to determine whether there is substantial evidence for the ALJ's decision. In this case, given the ALJ's lengthy discussion of the lack of objective evidence supporting Claimant's alleged physical limitations, his wife's description of his limitations and activities was essentially redundant.

and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic case Filing in the Unites States District Court for the Norther District of West Virginia.

DATED: January 6, 2006

 /s/ James E. Seibert
JAMES E.  SEIBERT
UNITED STATES MAGISTRATE JUDGE